2002 ME 57

**ACADIA INSURANCE COMPANY**

v.

**KEISER INDUSTRIES, INC.**

Supreme Judicial Court of Maine.

Argued: March 7, 2002.
Decided: April 9, 2002.

Thomas S. Majerison (orally), Norman, Hanson & DeTroy, LLC, Portland, for plaintiff.

Eric F. Saunders (orally), Jennifer D. Sawyer, Bernstein, Shur, Sawyer & Nelson, P.A., Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

ALEXANDER, J.

[¶ 1] Keiser Industries, Inc. (Keiser) appeals from a judgment of the Superior Court (Cumberland County, *Humphrey, J.*), after a jury-waived trial, finding that losses claimed by Keiser were not covered losses insured against by an insurance policy issued by Acadia Insurance Company. Keiser contends that losses resulting from a corporate officer's misuse of the company credit card, discovered in March 1998 and reported to Acadia fifteen months later, should be covered losses sustained as a result of employee dishonesty. Because the record supports the trial court's findings, and the trial court's interpretation of the Acadia policy is not erroneous as a matter of law, we affirm the judgment.

## I. CASE HISTORY

[¶ 2] The factual history of this case is largely undisputed. The issues in dispute involve application of the facts to Acadia's insurance policy and interpretation of that policy.

[¶ 3] Keiser is a corporation located in Oxford, Maine, that constructs modular homes. In 1996, Keiser hired Glenn Searl. Searl was promoted to chief operating officer in December 1996. In 1997, he became both president of Keiser and a director of the corporation.

[¶ 4] After an independent audit in early March 1998, Bruce Saunders, the chairman of the board at Keiser, testified that Keiser discovered that Searl had been using the company credit card for personal purchases. The auditor informed Saunders and the board of directors that Searl had made approximately $40,000 in personal charges. According to Saunders, the charges were unauthorized, because Searl's job description stated that the corporate charge card was to be used only for "company-related expenses" and Searl had no other authority to charge personal items to the corporation.

[¶ 5] Saunders informed Searl that his use of the company card was improper. In response, Searl promised that he would discontinue use of the card for personal purchases and pay back the personal charges to Keiser within two weeks. Saunders did not take any further action against Searl, and Saunders did not follow up to verify that Searl had paid the money back. At this point, no one at Keiser notified its insurer, Acadia, about Searl's actions.

[¶ 6] Searl did not repay Keiser within the two-week period as promised, and he continued to make personal charges to the company card. No further action regarding Searl was taken for approximately one year.

[¶ 7] In the spring of 1999, Saunders learned from the independent auditor that Searl had continued to make personal charges to the company card, and that the total of Searl's first year purchases actually amounted to $71,000, not $40,000. According to the auditor, by March 1999, Searl's personal charges totaled between $225,000 and $250,000. Saunders again approached Searl to discuss the charges. He did not terminate Searl's employment, but instead tried to get Searl to repay his debt to Keiser. After Saunders's efforts failed to recoup any of the money Searl

owed, Searl's employment was terminated on May 27, 1999.

[¶ 8] A general commercial insurance policy issued to Keiser by Acadia contained coverage provisions for losses sustained as a result of employee dishonesty.[1] On June 15, 1999, Keiser filed a proof of loss statement with Acadia, claiming $287,569.90 in losses resulting from the unauthorized charges made by Searl to the company credit card account. Acadia denied coverage under the dishonesty clause and filed this declaratory judgment action pursuant to M.R. Civ. P. 57. In its complaint, Acadia alleged that Searl's dishonest acts were discovered by Keiser no later than March 1998 and, pursuant to the policy, coverage was unavailable because (1) coverage under the policy terminated upon discovery of the dishonesty, and (2) no proof of loss had been filed either as soon as possible or within 120 days of discovery of the loss, as required by the policy.[2]

[¶ 9] Acadia filed a motion for summary judgment. The Superior Court denied Acadia's motion on the grounds that genuine issues of material fact existed as to (1) when Searl's acts were discovered to be dishonest; and (2) whether Keiser's chief financial officer and secretary after August 1997, was an officer within the meaning of the policy.

[¶ 10] After a bench trial, the Superior Court found that Keiser's determination, as of March 1998, that Searl's conduct was "an error in judgment, not a dishonest act[,]" was "not objectively reasonable under the circumstances." The court concluded that the policy was canceled as to Searl after March 1998, because the policy provided that coverage was canceled when an act of dishonesty is discovered by a corporate officer. The court also concluded that the policy required Keiser to notify Acadia of the loss "as soon as possible" and Keiser had failed to do so because they: (1) knew of the loss as of March 1998; (2) should have considered Searl's conduct dishonest at that time; and (3) did not notify Acadia until June 15, 1999. Thus, the court concluded that Keiser did

---

1. The portion of the Acadia policy concerning employee dishonesty provided as follows:

    2. **Additional Condition**
    **Cancellation As To Any Employee:**
    This insurance is canceled as to any "employee":
    a. Immediately upon discovery by:
    (1) You; or
    (2) Any of your partners, officers or directors not in collusion with the "employee";
    of any dishonest act committed by that "employee" whether before or after becoming employed by you.

    . . . .

    3. **Additional Definitions**
    a. *"Employee Dishonesty"* in paragraph A.2. means only dishonest acts committed by an "employee", whether identified or not, acting along or in collusion with other persons, except you or a partner, with the manifest intent to:
    (1) *Cause you to sustain loss; and also*

    (2) Obtain financial benefit (other than employee benefits earned in the normal course of employment, including: salaries, commissions, fees, bonuses, promotions, awards, profit sharing or pensions) for:
    (a) The "employee"; or
    (b) Any person or organization intended by the "employee" to receive that benefit.

2. Section B.5. of the crime rider in the Acadia policy states:

    5. **Duties in the Event of Loss:** After you discover a loss or a situation that may result in loss of, or loss from damage to, Covered Property you must:
    a. Notify us as soon as possible.
    b. Submit to examination under oath at our request and give us a signed statement of your answers.
    c. Give us a detailed, sworn proof of loss within 120 days.
    d. Cooperate with us in the investigation and settlement of any claim.

not comply with the notice of loss requirements. In addition, the court found that Acadia was prejudiced by Keiser's late notice, because Acadia could not recoup any of the loss in an action against Searl since, by the time Acadia was notified, Searl's assets had been "dissipated." Accordingly, the court held that Acadia's policy did not cover the losses claimed by Keiser. This appeal followed.

## II. DISCUSSION

[¶ 11] Keiser argues that the trial court erred when it found that the board's March 1998 determination that Searl's acts were not dishonest was not objectively reasonable. Keiser asserts that this finding was improper for two reasons. First, Keiser alleges that the facts and circumstances justified the board's determination. Second, Keiser argues that the court's finding was improper, because the term "dishonest" is ambiguous and ambiguous terms in an insurance contract should be construed in favor of coverage.

[¶ 12] Where Keiser had no written policy regarding personal charges to company credit cards, except for the job description directive that the company credit cards were to be used only for "company-related expenses," its actions responding to a discovery of at least a $40,000 violation of its prohibition on personal use of credit cards must be judged against ordinary standards of reasonableness. This standard leaves considerable discretion to the factfinder.

[¶ 13] The trial court found that Keiser's determination was not objectively reasonable and, inferentially, that it should have recognized that Searl's acts were dishonest in March 1998, because: (1) Keiser learned in March 1998 that Searl had made personal charges that, at a minimum, amount-

ed to $40,000; (2) Keiser was aware that Searl "did not have authority or permission to use [the company credit card] in that fashion"; (3) Searl had admitted that his actions were improper and promised Saunders that he would repay the money within two weeks; and (4) most significantly, Keiser knew or reasonably should have known two weeks after Saunders confronted Searl, that Searl had not fulfilled his promise to repay the debt.

[¶ 14] We review findings of fact in the light most favorable to the trial court's judgment to determine if the findings are supported by competent evidence. *See Jenkins, Inc. v. Walsh Bros., Inc.,* 2001 ME 98, ¶ 13, 776 A.2d 1229, 1234–35; *see also State v. Turner,* 2001 ME 44, ¶ 6, 766 A.2d 1025, 1027. There is competent evidence in the record to support the trial court's finding that Keiser's response to discovery of Searl's misuse of his credit card was not objectively reasonable.

[¶ 15] Whether the terms in an insurance contract are ambiguous is a question of law. *Geyerhahn v. U.S. Fidelity & Guar. Co.,* 1999 ME 40, ¶ 12, 724 A.2d 1258, 1261. Terms are considered ambiguous if they are " 'reasonably susceptible [to] different interpretations.' " *Id.* (quoting *Cambridge Mut. Fire Ins. Co. v. Vallee,* 687 A.2d 956, 957 (Me.1996)). If the terms in a policy are ambiguous, the ambiguity is construed in favor of coverage. *Id.*

[¶ 16] Keiser asserts that the term "dishonest" is ambiguous and is subject to a reasonable interpretation, that an essential element of dishonesty is "the intent to deceive" and that dishonesty involves "secrecy and concealment." Keiser argues that because Searl's spending was "open and fully disclosed," his acts could reasonably be construed as not being dishonest.[3]

[¶ 17] Even if Keiser's argument was sound, it logically breaks down at the point that Searl failed to repay two weeks after Saunders contacted Searl about his unauthorized spending as he had promised. At the very latest, it is at this point that Searl's acts became dishonest and reasonably should have been discovered and addressed.

[¶ 18] Because Keiser's policy provided that coverage was canceled as to the dishonest individual's acts upon discovery of the dishonesty, coverage as to Searl's acts was terminated, at the latest, two weeks after Saunders confronted Searl about repayment. Further, Acadia is relieved of any duty to pay the $40,000 or $71,000 loss, because Keiser's proof of loss was filed well outside the time specified in the policy, and the trial court's finding of prejudice to Acadia is supported by the evidence. *See Ouellette v. Maine Bonding & Cas. Co.*, 495 A.2d 1232, 1235 (Me.1985).

The entry is:

Judgment affirmed.

---

3. Keiser's argument on this point seems to be that *it need not have viewed Searl's acts as* dishonest, but Acadia must pay Keiser's loss under the dishonest employee clause.